ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF PENNSYLVANIA**

ROHAN R. PERSAUD
A38-746 586 ]
      PETITIONER, ]
]
]
     V. ]     CIVIL No. 1:01-CV-01255
]
]     Hon. Judge Sylvia H. RAMBO
JOHN ASHCROFT, el Al, ]
      RESPONDENTS. ]

**FILED**
HARRISBURG, PA

AUG 1 7 2001

MARY E. D'ANDREA, CLER
Per _____
Deputy Clerk

<u>PETITIONER"S REBUTTAL TO RESPONDENT</u>
<u>OPPOSSITION TO THE WRIT PETITION.</u>

    And now comes, Rohan R. Persaud, pro se, hereinafter
refered to as "Petitioner", moves the court to file this rebuttal
to the respondents opposition to the writ petition. As grounds
set forth herein, petitioner believed strongly that respondent'S
opposition is without merit and interpretetion of the supreme
court ruling very deceiptive, thus diagree in toto.

    Petitioner plea this court to still construe this said
petition liberally, allow merits sought by petitioner, less
strigent standarts than a formal papers drafted by a lawyer in
order to avoid penalty, procedural bar or dismiss on technicality
See.. <u>Parris V. Conghlin</u>, No 90-CV-414, 1993 W.L.328199, at 4 (
N.Y. 1993); also <u>Haines V. Kerner</u>, 404 U.S. 519 (1972).

<u>ARGUMENT IN SUPPORT.</u>

    The court is familiar with this present case and all
backgrounds and relief sought by petitioner, thus would not need
to reiterate them and states as his continued , indefinited and

abusive and deliberate confinement despite the highest court ruling in Zadvydas V. Davis, No. 997791, June 28, 2001. As petitioner well raised his substantive due process violations challenges grounds in the argument about detention issues, lack of proper review process, artificial and perfunctory in nature, on procedural grounds, will simply restatates the former under the substantive.

Generally, prior to the supreme court decision in Zadvydas, Id, and Ashchoft V. MA, No. 0038 (june 28, 2001), the appeals court of the ninth(9th) Circuit, in Ma, 208 F.3d at 831 (2000) held on the issues petitioner (Mr. Persaud) raised in this petition on whether congress provides INS with such authority to detain aliens indefinitely under 8 U.S.C. §1231(a)(6) as in here, the court have ruled that INS lack such power under the Law. That in sum, After an alien is founded removable, specially a permanent resident as petitioner, the attorney general is require to remove such alien within (90) days after the removal-order become administratively final, and where such removal can'nt be effectuated within such 90 Days removal period, the alien must be giving a "searching review" and soon after, if praticable must be removed within a reasonable time beyong the statutory period. Ma V. Reno, 56 F.Supp. 2d 1165 (W.D. Wash. 1999); also Zadvydas V. Underdown, 185 F.3d 279 (1999).

The court also aswer the question on whether the court has authority to impose that amounts to reasonable time or foreseeable future time, the courts have always answer in the affirmative (Yes). See Ma, supra (Supreme court, appellate and federal court); also Caranica V. Nagle, 28 F.2d 95 (9th Cir 1928)(holding that two(2) Months deadline to be reasonable).

In responding to petitioner assertions in the writ petition, respondent did advanced those arguments and facts that those not fit the range of logic and ruling of the highest court ruling in Zadvydas V. Davis.

Petitioner will first address the goverment violation of the perfunctory and artificial review he was given and interpretation of respondent view which constitue an abuse in the case.

Refering to petitioner review, the Third circuit court of appeal set in Ngo, that continued detention of an alien who was excludable (here a permanent resident) under the Immigration Act, but whose country of origin has refused to allow his return violated aliens due process rights where alien was repetedly denied parole on the basis of no more than "a reading of his file that listed "years old conviction" for fire arm, attempted robbery, bail jumping and no inquiry was made by INS to ascertain whether threat to community posed by alien and risk of flight warranted continued custody. Ngo, 192 F.3d 390, 396 (3rd Cir1999)

In Jackson V. Indiana, 406 U.S 715 (1972), the court held that where detentions "goal" is no longer praticable or pratically attainable, detention no longer bear[s] [a] reasonable relation to the purpose for which the individual was commit to and the court have nothing in the history of those statutes that clearly demonstrates a congressional intent to authorize indefinite, perhars permanent detention as in Mr Persaud case here and consequently, interpreting the statute to avoid a serious constitutional threat and conclude that once removal is no longer reasonably forseeable, continuel detention is no longer

authorized by the statute. See IE. COKE, Institutes *70b (
cessante ratione legis cessat ipse lex)[the rationale of a legal
rule no longer being applicable, that rule it self no longer
applies] Quotation, <u>Zadvydas V. Davis</u>, Id.

Moreover, It is clean crystal clear that petitioner as
a long permanent resident of the United States in here, has being
denied parole based on a <u>bearly reading</u> of his <u>record</u> that listed
misminors and two(2) felonies (D.W.I) prohibited by the <u>Ngo</u> court
and petitioner's programms of rehabilitation, families support
letters, certificates and lack of disciplinary Act in prison and
detention of INS mix-out-weight. Petitioner has met his proofs
of eligibility of parole established by the <u>Ngo</u> court, thus
reaffirmed his contension that his Review by INS officials was
searchless, artificial and perfunctory in nature which constitute
an abuse, capricious and deliberate in violation of due process
of law under the Fifth(5th) Amendment of the United States. ExH . D

Respondent also states that, petitioner was not removed
to his native Guyana because he "<u>successfully</u>"requested a Stay of
removal and was granted. Futher down the line, respondent did
advanced another logic, that petitioner will <u>Flee</u> if released
because of light of petitioner's "<u>unsuccessful</u>" efforts to have
his order of removal reversed.

However, petitioner is deceived by such reasoning of
respondent that are totaly in conflict with one-another due to
the fact that, If petitioner would not desirer to have his removal
order reversed, petitioner would not seek a stay pending the BIA
decision on the motion for reconsideration or seek redress in
this present case after petitioner was violated due process of

In <u>Wolck V. Weedin</u>, 58 F.2d 928, 930-31, the court held that it will be appropriate for the government within one(1) months (30 days) to implement the order which was imposed by the court and failure will be an abuse.

The court have long established that detention pending removal was not intended by congress as punishement and detention was evil with no forseeable deportation and was an abuse from the attorney general discretion. <u>Kay V. Reno</u>, 2000 W.L. 432606 (M.D. PA 2000, <u>Judge Sylvia H. Rambo</u>); <u>INS V. Lopez-Mandoza</u>, 486 U.S. 1032 (1984); <u>Fernandez V. Wilkinson</u>, 505 F. Supp. 787 (1980).

The tenth (10th) circuit court of appeals observed that the prolongued detention of an alien in deportation was "punishment" as severe as apply to own worst criminals (Citizens). See <u>Rodriguez-Fernander V. Wilkinson</u>, 684 F.2d at 1385.

A fortiori, respondents (INS) has no such power under the immigration laws and in particular under § 1231(a)(6) to detain petitioner a lawful permanent resident who entered the Unites States over decades and by erroneous removal order is just not possible, thus such detention is unlawful and capricious that need to be strike by this Honorable court as in <u>Kay</u>, Id.

In this present juncture, respondent did not show the court or petitioner the "high extraordinary" burden that he will be removed or can be removed to his native Guyana in the foreseeable future where INS has all documents to effectuate and negotiate petitioner's repatriation from the United States by ending this continue and unlawful detention in a <u>maximum security jail</u> and following the lapse of reasonable time.

In the similar precedent, this court rules in Kay, Id that continued detention of alien who was subject to a final order of deportation violated petitioner (Kay) substantive due process rights where his country of origine refused to allow his return and that an alien who had been in custody for years demonstrated an enhanced risk of flight and it was extremely unlikely that the alien would be deported in the forseeable future and petitioner's liberty is restrained and it is the government that is responsible. at page 4 (Footnote 3, 13th line).

This same court did invoke two(2) factors by deciding Kay, Civ No A-1-CV-99-0251 (April 19, 2000), and clearly states as follow: First, the government interest, which detention was found excessive due to the lack of likelyhood that INS will be able to effectuate deportation and Second,the lenght in detention of the alien which become less compelling and the invasion into the alien's liberty more severe.

At this present time in this case, it appears to be unlikely or even slim to none, that petitioner will be removed to Guyana in the foreseeable future and respondent did not show this court any evidence requesting "travel Documents" for Mr. Persaud (petitioner) who has been in custody for while (8 Months INS).

Petitioner afterwards is showing this honorable court that while in States costody and INS detention, he has made exemplary adjustment with respect to all others fellow inmates, staff members, rules and regulations of the prisons, shown remorse for his criminal conduct, although petitioner's criminal conduct araise couple days before Christmas from family distress, thus was driking and driving slitely sobered and was pull-over by

a N.Y.P.D officer and pleaded guilty for D.W.I.

Petitioner also has well complected Alcoholic Anonymous Programs and received certificates and never had one(1) single infraction or disciplinary action in prison or detention which makes it extremely unlikely to pose any risk of non compliances with this court order of parole under 241.5 or Bail to secure petitioner liberty or in the alternative release from INS order by this Honorable court to end the extremely cruel detention.

Petitioner avers and confirm at this moment being wrongfully confined by respondent and miscontruing petitioner's detention to be proper and his conviction to be used as a crime of violance which was over-turned[reversed] by the Texas court by ruling that INS can'not use D.W.I as a crime of violence in deportation proceeding. See <u>Case law Attached for support.</u>.Exh.A. B

Futhermore, this court also agreed with the decision in <u>Ngugen V. Fusano</u>,84 F.Supp 2nd 1099 (S.D.Cal 2000), that "after some lenght of time in custody and removal is not praticable in a foreseeable future, petitioner's liberty surpasses the governments disminished interest and detention becomes punitive in relation to the INS regulatory goals" at 1113. See also <u>Sengchanh V. Lanier</u>, No. Civ.A 197-CV-3204 WBH, 2000 W.L 242056 at 5, 89 F.Sup 2d 1356 (N.D.GA Jan 28, 2000), <u>Hermanowski V. Ferguharson</u>, 39 F.Supp. 2d 148, 159 (D.R.I. 1999).

Petitioner, however's removal is impossible and could not be effectuated in a reasonable time frame due to the lack of repatriation-agreement with the United States and Guyana refuse to issue travel document to petitioner's own sister on behalf of petitioner to gain freedom. See Exhibit Attached.. Exh.: C

The rationale underlying the court decisions was that detention was intended for the sole purpose of effecting removal and once it became evident that the removal was not realizable in a time frame [forseeable future], the continued detention of the alien with the removal order was found to be without cause and detention beyong this period set six(6) months (at that time) was "automatically terminated". See Kusman V. District Dir. of INS, 117 F.Supp. 541 (S.D.N.Y, 1953); Ross V. Wallis, 279 F.2d 401 (2nd Cir. 1922); Brooks, 5 F.2d 238 (D.Mass. 1925); Caranica V. Nagle,28 F.2d 955 (9th Cir. 1928); Wolck, 58 F.2d 928 (1932); In re Hanoff, 39 F.Supp. 169 (D.Cal. 1941); Janavanis V. Nicolls, 47 F.Supp. 201 (D.MAss 1942) and Wong Wing V. INS, 163 U.S at 235 16 S.Ct at 980 .

In Paxton V. INS, 745 F.Supp. 1261 (E.D.Mich 1990), the court followed the ruling in salerno (481 U.S. 739 (1987)) and looked at the legislative intent behind such statute[8 U.S.C § 1252(a)(2)] to determine if, the regulation was permissible. In its analysis, the federal court determined the regulation was excessive in light of the "goals" that statute sought to achieve which mandate detention of felon by the attorney general which on the court view was precisely the type of government conduct that "shocks the conscience" and interferes the rights implicit in the concept to order liberty.

R.j

By equally compeling assertion of petitioner, since petitioner order was finally entered on November 16, 1999, INS did have more than one(1) year from the date the order became administratif final from the date petitioner was released from state custody to secure petitioner's travel documents to effectuate removal to Guyana on december 2000. Till date, respondent did not and can not show the court any type of request from the Guyaness authority and the reason of successful stay from the BIA must definitely fail. Such logic just dont support this abusive detention in a maximum prison. Ultimately, such argument is merit less as well.

<u>ARGUMENT IN SUPPORT II</u>.

### 212(c) Waiver eligibility:

In responding, respondent tended to be based on the BIA decision dated December 28, 2000, that petitioner was ordered removed on his DWI conviction (Footnote 2, page 3 response).

Primarily, that is not true because it is clear to the court as petitioner's attorney brief for reconsideration that the Immigration judge did make a finding of remouvability based on the 13 years old assault charge.

In high supposition, If it is understood that petitioner was ordered removed to Guyana on his DWI felony, petitioner however at this juncture present a legitimate claim to have such order reversed based on the Fifth (5Th) federal appeals court ruling that Immigration Officials interpretation of DWI to be a crime of violance can not substain. See U.S. V. Moises Chapa-Garza, (No.00 5046), Campos (00-50051) et al..(W.D.TX March 1st, 2001) Copy attached.

9./

In U.S. V. Moises Chapa-Garza, Id, the court held that because intentional force against person or property of another is seldom, if even, employed to commit the offense of felony DWI, such offence is not a crime of violance definited in 101(A)(F) of the Immigration act.

However, petitioner here should said that because 212(c is available in removal proceedings, he still eligible for such waiver based on those opinion of the Supreme court in St Cyr V. INS; Matter of Gabrielsky, Interim Decision 3213 (BIA 1993); Meldrine Skelly V. INS, 1999 U.S App Lexis 2642 (2nd Cir 1999). Moreover, the instant court should find petitioner's Removal order to be bogus and detention arbitrare.

In the other hand, petitioner will not argue the issue of his right to such waiver 212(c), if it happen, that petitioner was order removed on the assault charge due to the fact that respondent did concur with petitioner eligibility if it was the case. Petitioner will submit a addendum brief after receiving the file requested by petitioner appropriately.

## CONCLUSION.

Therefore, petitioner respectfully prays this honorable court to grant the Writ and any and all other relief the court deems proper in the promise.

Respectfully submitted

Executed on 14 Day of August, 2001.

Rohan R Persaud.
Rohan R. Persaud, pro se
A38-746-586
Towel 3, Echo K-24
1371 N. Washington Ave
Scranton, PA 18509

ExH. A

Their ... ...
lowed Republicans to cont... ...
their "personal attacks" against
Clinton. *WEDNESDAY* 3/7/2001

## Court stops INS from deportation

SAN ANTONIO — A federal appeals court has halted the Immigration and Naturalization Service's policy of deporting immigrants convicted of driving while intoxicated.

The 5th U.S. Circuit Court of Appeals ruled Thursday in New Orleans that felony DWI convictions in Texas are not crimes of violence like assault, rape and murder.

That was the basis the INS used to deport many immigrants in recent years, including more than 500 arrested during a 1998 roundup dubbed Operation Last Call.

Immigration lawyers hailed the decision and said the ruling could enable those previously deported to return to Texas, Louisiana and Mississippi — the states under the appellate court's jurisdiction.

The INS said it has not decided what to do next. The agency can appeal.

Ex H. C

## Canadian Immigration Officials Want to Deport Guyanese Man Convicted of Robbery But Guyana Won't Take Him Back

**Toronto:** Immigration officials will try to have a Kitchener man, convicted recently of his seventh robbery, deported to his native Guyana, an official says.

Klaudio Mustakas, manager of the Waterloo-Wellington Citizenship and Immigration office, said.

Aubrey Gittens, 45, has been under a deportation order since 1992.

"We have an outstanding deportation order we have to execute," Mustakas said.

A judge sentenced Gittens to three years in prison for his latest robbery of a Little Short Stop store at 366 Victoria St. N. in Kitchener, on April 21.

Gittens' lawyer, Frank Retar, said Gittens is addicted to crack cocaine and committed the robbery to get money for cigarettes.

He said Gittens had smoked some crack, and was on his way into work at Stack-a-Shelf when he decided he needed money for cigarettes. He went into the corner store to use their ATM machine, but it wasn't working, so Gittens went up to the clerk and said, "Give me some money."

The clerk told him to come and get it, so Gittens grabbed the till and ran off. But not before the clerk, 26-year-old David Johrendt, ripped off his jacket, court heard. The jacket contained his wallet and identification.

In the past 13 years, Gittens has only been out of jail for 10 months, Retar said. He's twice received treatment for his addiction.

His record includes convictions for four bank robberies in Toronto in 1990.

Gittens, who came to Canada from Guyana at age nine, was first ordered deported in 1992. But it appears he won an appeal, according to Retar. Mustakas said he would only have received a stay, and that if he "kept his nose clean" during the stay, the order could be rescinded.

But Gittens was convicted of robbery again in 1998. He was sentenced to two years in prison. After that, he was put in immigration lockup, but got out on bail. It appears that while immi-
were trying to proceed with deportation, he

# ExH. B

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 99-51199

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MOISES CHAPA-GARZA, also known as

Moises Garza, also known as

Moises Garza Chapa, also known as

Moises G Chapa, also known as

Moises Chapa,

Defendant-Appellant.

No. 00-50049

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIAN RICARDO GOYTIA-CAMPOS,

also known as Julian Ricardo

Goitia-Campos,

Defendant-Appellant.

No. 00-50051

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFONSO GUADALUPE PEREZ-VELAZQUEZ,

also known as Erick Lee,

Defendant-Appellant.

---

No. 00-50107

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANCISCO JAVIER SALDANA-ROLDAN,

Defendant-Appellant.

No. 00-50239

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EPIFANIO IVARBO-MARTELL,

also known as El Chino,

Defendant-Appellant.

_____

Appeal from the United States District Court

for the Western District of Texas

_____

March 1, 2001

Before GOODWIN[1], GARWOOD and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Moises Chapa-Garza, Julian Ricardo Goytia Campos, Alfonso Guadalupe Perez Velazquez, Francisco Javier Saldana Roldan and Epifanio Ivarbo-Martell appeal their sentences. We VACATE their sentences and REMAND for resentencing.

### Facts and Proceedings Below

All five of the defendants-appellants pleaded guilty to unlawfully being in the United States after removal therefrom, in violation of 8 U.S.C. § 1326(a). For violating section 1326(a), U.S.S.G. § 2L1.2 provides for a base offense level of 8, with an increase of 16 offense levels if removal from the United States was preceded by a conviction for an "aggravated felony".[2] Application Note 1 of guideline 2L1.2 refers to 8 U.S.C. § 1101(a)(43) for the definition of "aggravated felony".[3] Section 1101(a)(43) lists several examples of offenses considered aggravated felonies. One of these, contained in section 1101(a)(43)(F),[4] is a "crime of violence" as defined in 18 U.S.C. § 16. 18 U.S.C. § 16 provides:

"The term "crime of violence" means--

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Over appellants' objections, the district courts applied guideline 2L1.2's 16 level increase, finding that Texas felony DWI[5] was a crime of violence as defined in 18 U.S.C. § 16(b). As a result, the sentence of each appellant was considerably higher than it otherwise would have been. At the time these appeals were taken, the sole issue raised by each defendant was whether Texas felony DWI is "an aggravated felony" under U.S.S.G. § 2L1.2(b)(1)(A). Because the issues were identical, the cases were consolidated for oral argument.

*Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000), was decided after the defendants-appellants filed their opening briefs. By a single supplemental brief, the defendants-appellants each raise the same *Apprendi* issue. 8 U.S.C. § 1326(a) provides that the maximum sentence shall be a fine and/or imprisonment up to two years. Section 1326(b)(2) increases the maximum penalty to a fine and/or imprisonment up to twenty years if the removal of the defendant was preceded by a conviction for an aggravated felony. The defendants-appellants' sentences ranged from 41 to 57 months, all well above the section 1326 (a) maximum. Defendants-appellants argue that, under *Apprendi*, the statutory maximum cannot be increased from two to twenty years unless the fact that triggers the higher maximum sentence of section 1326(b)(2), a prior aggravated felony conviction, is alleged in the indictment. Defendants-appellants concede that their argument is foreclosed by *Almendarez-Torres v. United States*, 118 S.Ct. 1219 (1998), and raise the issue in this Court only to preserve the possibility of review by the United States Supreme Court.

Our disposition of these two legal issues will resolve all five appeals.

### Discussion

#### I.

This Court reviews the district court's interpretation of the Sentencing Guidelines *de novo* and its application of the guidelines for clear error. *United States v. Cho*, 136 F.3d 982, 983 (5th Cir. 1998). Defendants-appellants' sentences must be affirmed unless they were imposed in violation of law or were based upon an erroneous application of the Sentencing Guidelines. *United States v. Velazquez-Overa*, 100 F.3d 418 (5th Cir. 1996).

18 U.S.C. § 16(b) is the only justification for the 16-level enhancement advanced by the government. Section 16(b)

provides that a crime of violence is "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The government correctly observes that the words "by its nature" require us to employ a categorical approach when determining whether an offense is a crime of violence. *Velazquez-Overa*, 100 F.3d at 420-21. This means that the particular facts of the defendant's prior conviction do not matter, e.g. whether the defendant actually did use force against the person or property of another to commit the offense. The proper inquiry is whether a particular defined offense, in the abstract, is a crime of violence under 18 U.S.C. § 16(b).

This is the second time a panel of this Court has been called upon to decide the question of whether felony DWI is a crime of violence as defined by 18 U.S.C. § 16(b). In *Camacho-Marroquin v. Immigration and Naturalization Service*, 188 F.3d 649 (5th Cir. 1999), *withdrawn* 222 F.3d 1040 (5th Cir. 2000), this Court held that felony DWI was a crime of violence. However, Camacho-Marroquin moved to withdraw his petition for rehearing en banc so that the Immigration and Naturalization Service could deport him in lieu of incarceration. As a result, the panel withdrew its opinion. *Camacho-Marroquin* had held that felony DWI was a crime of violence because of the substantial risk that drunk driving will result in an automobile accident. *Camacho-Marroquin*, 188 F.3d at 652. The government agrees with this approach and urges that anytime an offense involves a substantial risk of harm, even accidental harm, that offense is a crime of violence.

We disagree with the government's proposed construction of section 16(b) for three reasons: 1) it requires that section 16 (b) be construed the same as U.S.S.G. § 4B1.2(a)(2), which now contains significantly broader language;[6] 2) "substantial risk that physical force . . . may be used" contemplates only reckless disregard for the probability that *intentional* force may be employed; and 3) the physical force described in section 16(b) is that "used in the course of committing the offense", not that force that could result from the offense having been committed.

A.

There are two possible constructions of the operative language of 18 U.S.C. § 16(b). The government urges that we interpret section 16(b) the same way the Seventh Circuit interpreted U.S.S.G. § 4B1.2(a)(2) in *United States v. Rutherford*, 54 F.3d 370 (7th Cir. 1995).[7] Under the guideline 4B1.2(a)(2) standard, any offense that involves "pure recklessness," i.e. a conscious disregard of a substantial risk of injury to others, is a crime of violence. The alternative reading is that section 16(b) applies only when the nature of the offense is such that there is a substantial likelihood that the perpetrator will *intentionally* employ physical force against another's person or property in the commission thereof. The latter approach requires recklessness as regards a substantial risk that intentional force will be utilized by the defendant to effectuate commission of the offense.

We begin by comparing the text of guideline 4B1.2(a)(2) with that of section 16(b). Guideline 4B1.2(a)(2)'s "otherwise" clause contains broader language than does section 16(b). Guideline 4B1.2(a)(2) only requires that the offense involve conduct that poses a serious risk of physical injury to another person. It does not require, as section 16(b) does, that there be a substantial risk that the defendant will *use* physical force against another's person or property *in the course of committing the offense*. Guideline 4B1.2(a)(2)'s otherwise clause concerns only the risk of one particular *effect* (physical injury to another's person or property) of the defendant's conduct. Section 16(b) is focused on the defendant's conduct *itself*, as there is no requirement that there be a substantial risk that another's person or property will sustain injury, but only that there be a substantial risk that the defendant will *use* physical force against another's person or property *in the course of committing the offense*.

In *United States v. DeSantiago-Gonzalez*, 207 F.3d 261 (5th Cir. 2000), this Court recognized the difference between section 16(b) and guideline 4B1.2(a)(2). *DeSantiago-Gonzalez* was applying, to misdemeanor DWI, the same guideline 4B1.2(a)(2) language that *Rutherford* applied to felony DWI.[8] More importantly, notwithstanding that *DeSantiago-Gonzalez* was decided before *Camacho-Marroquin* was withdrawn, *Camacho-Marroquin* was not given

"controlling effect because it was a deportation case wherein the applicable definition of 'crime of violence' was found at 18 U.S.C. § 16, which defines the term 'crime of violence' in language similar to but not identical with the definition which controls the sentencing issue presented in this appeal found at U.S.S.G. § 4B1.2(a)."

*DeSantiago-Gonzalez*, 207 F.3d at 264.

Effective November 1, 1989, the definition of crime of violence under guideline 4B1.2(a)(2) was changed from a reference to section 16(b) to that which now appears. This change counsels against interpreting section 16(b) and guideline 4B1.2(a)(2) the same way.

Besides the aforementioned reasons to interpret section 16(b) differently than guideline 4B1.2(a)(2), we believe that the "substantial risk that physical force . . . may be used" language in section 16(b) refers only to those offenses in which there is a substantial likelihood that the perpetrator will intentionally employ physical force. The criterion that the defendant use physical force against the person or property of another is most reasonably read to refer to intentional conduct, not an accidental, unintended event. The American Heritage College Dictionary (3rd ed. 1997) defines the verb "use" as:

"1. To put into service or apply for a purpose; employ. 2. To avail oneself of; practice: *use caution*. 3. To conduct oneself toward; treat or handle: *used his colleagues well*. 4. To seek or achieve an end by means of; exploit: *felt he was being used*. 5. To take or consume; partake of: *She rarely used alcohol*."

The four relevant definitions indicate that "use" refers to volitional, *purposeful*, not accidental, employment of whatever is being "used". Our understanding accords with the Third Circuit's in *United States v. Parson*, 955 F.2d 858 (3rd Cir. 1992). Although *Parson* involved interpretation of guideline 4B1.2(a)(2), the Third Circuit found it necessary to discuss the history of the career offender guideline, including a comparison of the pre November 1, 1989, language (which referred to 18 U.S.C. § 16) and the current language:

"[T]he second branch of the definition in section 16 covered only felonies that 'by nature, involve[] a substantial risk that physical force . . . may be used,' whereas the revised definition in the current Guideline's second prong [§ 4B1.2(a)(2)] covers conduct that 'presents a serious risk of physical injury.'

At first blush, the difference in phrasing appears trivial because most physical injury comes from the use of physical force. But the distinction is significant. Use of physical force is an intentional act, and therefore the first prong of both definitions [section 16(a) and guideline 4B1.2(a)(1)] requires specific intent to use force. As to the second prong of the original definition, a defendant's commission of a crime that, by its nature, is likely to require force similarly suggests a willingness to risk having to commit a crime of specific intent. For example, a burglar of a dwelling risks having to use force if the occupants are home and hear the burglar. In such a case, the burglar has a mens rea legally nearly as bad as a specific intent to use force, for he or she recklessly risks having to commit a specific intent crime.

In contrast, under the second prong of the revised definition, criminals whose actions merely risk causing physical injury may have a lower mens rea of 'pure' recklessness: they may lack an intent, desire or willingness to use force or cause harm at all. For example, a parent who leaves a young child unattended near a pool may risk serious injury to the child, but the action does not involve an intent to use force or otherwise harm the child. Similarly, a drunk driver risks causing severe injury to others on the road or in the car, but in most cases he or she does not intend to use force to harm others. In this case, the crime of reckless endangering necessarily involves a serious risk of physical injury to another person, but not necessarily an intent to use force against other persons."

*Id.* at 866. This passage explains not only the proper construction of section 16(b), but also highlights the material difference in scope between it and guideline 4B1.2(a)(2). Accordingly, we refuse to read section 16(b) as we do guideline 4B1.2(a)(2), and hold, consonant with the ordinary meaning of the word "use," that a crime of violence as defined in 16(b) requires recklessness as regards the substantial likelihood that the offender will intentionally employ force against the person or property of another in order to effectuate the commission of the offense.

B.

Another aspect of section 16(b) that bears upon the question of whether felony DWI is a crime of violence is the requirement that the physical force be applied "in the course of committing the offense". The meaning of these words is exemplified in this Court's decision of *United States v. Velazquez-Overa*, 100 F.3d 418 (5th Cir. 1996). In *Velazquez-Overa*, we held that the crime of indecency with a child involving sexual contact was a crime of violence as defined in 18

U.S.C. 16(b) because it was likely that the perpetrator would find it necessary to use physical force to "ensure the child's compliance" and "perpetrate the crime". *Id.* at 422. *Velazquez-Overa* explicitly distinguished guideline 4B1.2(a)(2) on this basis.

"The definition of 'crime of violence' in the career offender provisions differs somewhat from that in 18 U.S.C. § 16. The touchstone of 'violence' in the career offender provisions is the risk that physical injury will result, rather than the risk that physical force may be used to carry out the offense."

*Id.* at 421 n.4. That section 16(b) refers only to that physical force that may be used to perpetrate the offense is in harmony with its requirement that the offender *intentionally* use the force against the person or property of another.

C. We turn now to the ultimate question we are called upon to decide. While the victim of a drunk driver may sustain physical injury from physical force being applied to his body as a result of collision with the drunk driver's errant automobile, it is clear that such force has not been intentionally "used" against the other person by the drunk driver at all, much less in order to perpetrate any crime, including the crime of felony DWI. The crime of Texas felony DWI is committed when the defendant, after two prior DWI convictions, begins operating a vehicle while intoxicated. *Intentional* force against another's person or property is virtually never employed to commit this offense. Accordingly, we hold that felony DWI is not a crime of violence as defined by 18 U.S.C. § 16(b).

In so holding, we are mindful that one of our prior opinions contains dictum that is not inconsistent with the government's view that section 16(b) should be construed, as guideline 4B1.2 is, to embrace crimes of simple recklessness. In *United States v. Galvan-Rodriguez*, 169 F.3d 217, 219 (5th Cir. 1999), this Court held that unauthorized use of another's motor vehicle, or joy riding, was a crime of violence as defined by section 16(b):

"Just as burglary of a vehicle involves a substantial risk that property might be damaged or destroyed in the commission of the offense, the unauthorized use of a vehicle likewise carries a substantial risk that the vehicle might be broken into, 'stripped,' or vandalized, or that it might become involved in an accident, resulting not only in damage to the vehicle and other property, but in personal injuries to innocent victims as well.

It is true that, as argued by Galvan, the unauthorized use of a motor vehicle will not always result in physical force to persons or property, as, for example, when a child takes the family car 'joyriding' without parental consent; however, there is a strong probability that the inexperienced or untrustworthy driver who has no pride of ownership in the vehicle will be involved in or will cause a traffic accident or expose the car to stripping or vandalism." (footnote omitted).

*Galvan-Rodriguez* did not require us to resolve the issue presented in the present appeal. Our resolution thereof is completely compatible with the holding in *Galvan-Rodriguez*, as it cannot be doubted that there is a substantial risk that physical force will be used against a vehicle in order to obtain the unauthorized access to it that is necessary for the commission of the offense of joy riding.

II. The *Apprendi* Issue

As the *Apprendi* issue was not raised below, we review only for plain error. As explained below, we are unable to find error in this respect, much less plain error.

Appellants recognize that the Supreme Court has held that the enhanced penalties contained in section 1326(b) were mere sentencing factors and not elements of a separate offense. *See Almendarez-Torres v. United States*, 118 S.Ct. 1219, 1226 (1998). They point out that Justice Thomas, one of the five justices who joined in the Supreme Court's *Almendarez-Torres* opinion, may no longer support its holding. *See Apprendi*, 120 S.Ct. at 2379. But no matter how much in doubt the continuing viability of *Almendarez-Torres* may be, that decision is not overruled unless and until the United States Supreme Court says it is. *State Oil v. Kahn*, 118 S.Ct. 275, 284 (1997). Until then, as conceded by the defendants-appellants, we are bound by *Almendarez-Torres*. Therefore, we reject defendants-appellants' argument that *Apprendi* prevents them from being sentenced to a term of imprisonment of more than two years.

## Conclusion

We hold that because intentional force against the person or property of another is seldom, if ever, employed to commit the offense of felony DWI, such offense is not a crime of violence within the meaning of 18 U.S.C. § 16(b). Accordingly, we VACATE the defendants-appellants' sentences and REMAND for resentencing.

## VACATED and REMANDED

1. Circuit Judge of the Ninth Circuit, sitting by designation.

2. U.S.S.G. § 2L1.2 provides:

"§2L1.2 **Unlawfully Entering or Remaining in the United States**

(a) Base Offense Level: **8**

(b) Specific Offense Characteristic

(1) If the defendant previously was deported after a criminal conviction, or if the defendant unlawfully remained in the United States following a removal order issued after a criminal conviction, increase as follows (if more than one applies, use the greater):

(A) If the conviction was for an aggravated felony, increase by **16** levels.

(B) If the conviction was for (i) any other felony, or (ii) three or more misdemeanor crimes of violence or misdemeanor controlled substance offenses, increase by **4** levels."

3. Application Note 1 provides:

"1. For purposes of this guideline--

. . . .

'Aggravated felony,' is defined at 8 U.S.C. § 1101(a)(43) without regard to the date of conviction of the aggravated felony."

4. 8 U.S.C. § 1101(a)(43) provides, in relevant part:

"(43) The term 'aggravated felony' means--

. . . .

(F) a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year;"

5. Tex. Penal Code Ann. § 49.09 provides that after two convictions for violating section 49.04, Driving While Intoxicated, subsequent convictions are third degree felonies instead of Class B misdemeanors.

6. Prior to the November 1, 1989, change, guideline 4B1.2, like the current version of guideline 2L1.2 (via 8 U.S.C. § 1101(a)(43)(F)), referred to 18 U.S.C. § 16 for the definition of "crime of violence".

7. U.S.S.G. § 4B1.2(a) provides:

"The term 'crime of violence' means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that--

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

In *Rutherford*, the Seventh Circuit held that drunk driving was a crime of violence under guideline 4B1.2(a)(2) because it is "a reckless act that often results in injury." *Rutherford*, 54 F.3d at 376-77. Rutherford's prior conviction was not for simple felony DWI, but for first degree assault. In Alabama (the jurisdiction of Rutherford's prior conviction), a person commits the offense of first degree assault if, while driving under the influence of alcohol or drugs, he causes bodily injury to another with a motor vehicle. *Rutherford* analyzed this prior conviction as though it were merely for DWI. *Id.* at 376.

8. *Desantiago-Gonzalez*, like the present case, involved an enhancement under guideline 2L1.2. However, guideline 2L1.2 contains two offense level increase options. The first is a 16 level increase for an aggravated felony. This is the increase applied to the defendants-appellants. The second is a four level increase if the defendant has a prior record that includes any other felony or three or more misdemeanor crimes of violence or misdemeanor controlled substance offenses. This was the enhancement at issue in *Desantiago-Gonzales*. For purposes of the four level enhancement only, Application Note 1, Clause 4 of guideline 2L1.2 expressly references guideline 4B1.2 for the definition of a crime of violence.

*Ex H D*

DEI-02B

FORM 2189 (5/97)       STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

## REPORT OF TIME ALLOWANCE COMMITTEE REVIEW

1.  FACILITY ___GOWANDA___          CONSIDERATION DATE ___8/15/00___

2.  INMATE ___PERSAUD, Rohan___        DIN # ___99R2330___

3.  CR DATE ___12/13/00___     ME DATE ___12/13/01___

4.  PRIOR FINAL CONSIDERATION DATES, IF ANY _____

5.  TOTAL GOOD TIME AVAILABLE - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | 1-0-0 |

6.  TIME TENTATIVELY LOST IN TIER III HEARINGS - - - - - - - - - - - - - - - - - - - -

    (a) amount _____ date _____     (d) amount _____ date _____

    (b) amount _____ date _____     (e) amount _____ date _____

    (c) amount _____ date _____     (f) amount _____ date _____

    Attach additional sheets if necessary.

7.  RESTORATION OF TENTATIVELY LOST GOOD TIME - - - - - - - - - - - - - - - - - - - - |               |

7a. IF APPLICABLE, RESTORATION OF PREVIOUSLY WITHHELD TIME UPON RECONSIDERATION - - - - - |               |

    REASONS _____

    _____

    _____

8.  TOTAL GOOD TIME WITHHELD (If Applicable) - - - - - - - - - - - - - - - - - - - - - | 0-0-0 |

9.  ALLOWANCE RECOMMENDED (Line 5 minus Line 8) - - - - - - - - - - - - - - - - - - - - | 1-0-0 |

    REASONS  Inmate is currently participating in school.  Inmate is currently in
    DWI program and is scheduled to graduate 8/30/00.  Must complete program — CR
    date stands.

10. RECONSIDERATION DATE, IF ESTABLISHED _____

    ___*Smith*___          ___D.S.S.___          ___8/16/00___
    SIGNATURE OF CHAIRMAN          TITLE          DATE

11. **SUPERINTENDENT'S ACTION**

    CONFIRM RECOMMENDATION _X_  OTHER DETERMINATION ___  SPECIFY _____

    ___*Hodges*___                    ___8-17-00___
    SUPERINTENDENT                    DATE

13. **COMMISSIONER'S DECISION**

    AFFIRMED ___*Wesley*___ MODIFIED _____  DATE ___8/23/00___

    COMMENTS _____

    _____

►**NOTICE TO INMATE:** Pursuant to 7 NYCRR, Chapter V, Part 262 all time allowance decisions are reviewed automatically by the Commissioner or his designee. The decision of the Commissioner or his designee is final. You may request reconsideration of any decision to withhold good time by writing to the facility Time Allowance Committee Chairman.

DISTRIBUTION:     White   - Central Office        Pink       - Guidance Unit
                  Green   - Inmate                Goldenrod - Parole Office
                  Canary  - Facility File

# CERTIFICATE OF COMPLETION

*This is to certify that*

**R. PERSAUD**

**99-R-2330**

*successfully completed the*

**Gowanda Correctional Facility**

**DWI Treatment Program**

*on September 2, 2000*

SR. CORRECTION COUNSELOR/ASAT

ASAT COUNSELOR/PROGRAM ASST

Form 6001 (Rev. 1/93)

**STATE OF NEW YORK**
**EXECUTIVE DEPARTMENT**
**DIVISION OF PAROLE**

PERSAUD, Rohan                          6069 874N
**NAME**                                **NYSID**
                                        99-R-2330

**NOTICE**

**REGARDING SUPERVISION FEES**

I understand that I will be required to pay a state mandated supervision fee of thirty dollars ($30.00) per month for every month I am on conditional release or active parole supervision, unless waived by the Division of Parole.

I also understand that payment of the monthly fee is due on the first of each month for the preceding month, interest or a late fee may be charged on late payments and that failure to comply may be considered by the Board of Parole should I apply for a Certificate of Relief from Disabilities or a Certificate of Good Conduct.

I certify that I have read the above and understand my responsibilities to the NYS Division of Parole.

10-10-00                                Persaud Rohan
**DATE**                                **SIGNATURE**

Mahesh
**WITNESS**

STATE OF NEW YORK

STATE OF NEW YORK
EXECUTIVE DEPARTMENT – DIVISION OF PAROLE

## APPLICATION FOR CONDITIONAL RELEASE TO PAROLE SUPERVISION

SENTENCE: ☒ State                ☐ Local        NYSID: _____6069 874N_____

I, ___Rohan PERSAUD_____, now confined in _Gowanda C.F._____ having been convicted

of _DWI:Alc. or Drugs 3rd Off. (D)_ and sentenced in the county of __Kings__ at a term of the __Supreme__

Court, Judge __Barros___ presiding, on the __2nd__ day of __March__ /20 1999 for the term of_1-0-0/3-0-0_

the maximum term of which expires on the ____13th_____ day of ___December___

20 __01___, here by apply for Conditional Release. I understand that I will be in the legal custody of the Division of Parole until the

__13th___ day of _Dec.___, 20 01_____, and agree to abide by the conditions of my release with the full knowledge that failure to do

so may result in my reimprisionment by order of the Board of Parole pursuant to law.

I, ___Rohan PERSAUD (99-R-2330)_____, voluntarily accept Parole supervision. I fully understand that my person, residence and property are subject to search and inspection. I understand that Parole supervision is defined by these Conditions of Release and all other conditions that may be imposed upon me by the Board or its representatives. I understand that my violation of these conditions may result in the revocation of my release.

### CONDITIONS OF RELEASE

1. I will proceed directly to the area to which I have been released and, within twenty-four hours of my release, make my arrival report to that Office of the Division of Parole unless other instructions are designated on my release agreement.

2. I will make office and/or written reports as directed.
3. I will not leave the State of New York or any other State to which I am released or transferred, or any area defined in writing by my Parole Officer without permission.
4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property. I will discuss any proposed changes in my residence, employment or program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes in my residence, employment or program status when circumstances beyond my control make prior discussion impossible.
5. I will reply, promptly, fully and truthfully to any inquiry of or communication by my Parole Officer or other representative of the Division of Parole.
6. I will notify my Parole Officer immediately any time I am in contact with or arrested by any law enforcement agency. I understand that I have a continuing duty to notify my Parole Officer of such contact or arrest.
7. I will not be in the company of or fraternize with any person I know to have a criminal record or whom I know to have been adjudicated a Youthful Offender except for accidental encounters in public places, work, school or in any other instance with the permission of my Parole Officer.
8. I will not behave in such manner as to violate the provisions of any law to which I am subject which provide for a penalty of imprisonment, nor will my behavior threaten the safety or well-being of myself or others.
9. I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my Parole Officer. I will not own, possess or purchase any deadly weapon as defined in the Penal Law or any dangerous knife, dirk, razor, stiletto, or imitation pistol. In addition, I will not own, possess or purchase any instrument readily capable of causing physical injury without a satisfactory explanation for ownership, possession or purchase.
10. In the event that I leave the jurisdiction of the State of New York, I hereby waive my right to resist extradition to the State of New York from any state in the Union and from any territory or country outside the United States. This waiver shall be in full force and effect until I am discharged from Parole or Conditional Release. I fully understand that I have the right under the Constitution of the United States and under law to contest an effort to extradite me from another state and return me to New York, and I freely and knowingly waive this right as a condition of my Parole or Conditional Release.
11. I will not use or possess any drug paraphernalia or use or possess any controlled substance without proper medical authorization.
12. Special Conditions: 1. I will seek, obtain and maintain employment and/or participate in academic/ vocational program as approved by Parole Officer. 2. I will participate in substance abuse treatment and testing as directed by Parole Officer. 3. I will abide by curfew as set by Parole Officer. 4. I will support dependent children. 5. I will participate in NA and/or AA as recommended. 6. I will not consume alcoholic beverages. 7. I will not frequent any establishment where alcohol is sold or served as its main business. 8. I will not operate any motor vehicle without written permission of Parole Officer and a valid New York state driver's license. 9. I will cooperate with all medical referrals and recommendations.

13. I will fully comply with the instructions of my Parole Officer and obey such special additional written conditions as he, a Member of the Board of Parole or an authorized representative of the Division of Parole, may impose.

~~XXXXX~~ RELEASE FUNDS see printout

SENTENCE: INDETERMINATE [ XX ]    DEFINITE [   ]    NYSID NO. 6069 874N

INS No. A38-746-586

PERSAUD, Rohan _____ now confined in Gowanda C.F. _____ who was convicted of DWI:Alc. or Drugs 3rd Of

and sentenced in the county of ~~X~~ Kings _____ at a term of the Supreme Court, Judge Barros _____ presiding

on the 2nd day of March ,19 99 , for the term of 1-0-0/3-0-0 the maximum term of which sentence

expires on the 13th day of December /19 2001 , has agreed to abide by the conditions to which (he) (she)

has signed (his) (her) name here below, and is herby granted ~~X~~ Conditional Release/ ☐ Parole by the Board of Parole, by virtue of the authority

conferred by New York State Law.

It is therefore directed that (he) (she) be released and placed under the legal jurisdiction of the Division of Parole until the 13th

day of December ,19 2001 .

Signed this _____ day of _____ , 19 ___ , at _____

Date of Release: 12/13/00    Board of Parole: _____

I, Rohan PERSAUD (99-R-2330) _____ , voluntarily accept Parole supervision. I fully understand
that my person, residence and property are subject to search and inspection. I understand that Parole supervision is defined by these
Conditions of Release and all other conditions that may be imposed upon me by the Board or its representatives. I understand that my violation
of these conditions may result in the revocation of my release. C)(cont.)that at no time while in the custody of Immigration authoriti
will I attempt to escape or escape.

**CONDITIONS OF RELEASE**

INS Warrant

1. I will proceed directly to the ~~area~~ to which I have been released and, within twenty-four hours of my release, make my arrival report
to that Office of the Division of Parole unless other instructions are designated on my release agreement. A/S Pasternack, P.O. Chung,
Brooklyn I.A.O., 350 LIvingston St., 5th Fl., Brooklyn, NY 11217, 718/802-9810.

2. I will make office and/or written reports as directed.

3. I will not leave the State of New York or any other State to which I am released or transferred, or any area defined in writing by my
Parole Officer without permission.

4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection
of my person, residence and property. I will discuss any proposed changes in my residence, employment or program status with my Parole
Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes in my residence, employment
or program status when circumstances beyond my control make prior discussion impossible.

5. I will reply promptly, fully and truthfully to any inquiry of or communication by my Parole Officer or other representative of the Division
of Parole.

6. I will notify my Parole Officer immediately any time I am in contact with or arrested by any law enforcement agency. I understand that
I have a continuing duty to notify my Parole Officer of such contact or arrest.

7. I will not be in the company of or fraternize with any person I know to have a criminal record or whom I know to have been adjudicated
a Youthful Offender except for accidental encounters in public places, work, school or in any other instance with the permission of my Parole
Officer.

8. I will not behave in such manner as to violate the provisions of any law to which I am subject which provide for a penalty of
imprisonment, nor will my behavior threaten the safety or well-being of myself or others.

9. I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my Parole Officer. I
will not own, possess or purchase any deadly weapon as defined in the Penal Law or any dangerous knife, dirk, razor, stiletto, or imitation pistol.
In addition, I will not own, possess or purchase any instrument readily capable of causing physical injury without a satisfactory explanation for
ownership, possession or purchase.

10. In the event that I leave the jurisdiction of the State of New York, I hereby waive my right to resist extradition to the State of New York
from any state in the Union and from any territory or country outside the United States. This waiver shall be in full force and effect until I am
discharged from Parole or Conditional Release. I fully understand that I have the right under the Constitution of the United States and under
law to contest an effort to extradite me from another state and return me to New York, but I freely and knowingly waive this right as a condition
of my Parole or Conditional Release.

11. I will not use or possess any drug paraphernalia or use or possess any controlled substance without proper medical authorization.

12. Special Conditions: Upon CR: 1. I will seek, obtain and maintain employment and/or participate in academic/vocational
program as approved by Parole Officer. 2. I will participate in substance abuse treatment and testing as directed
by Parole Officer. 3. I will abide by curfew as set by Parole Officer. 4. I will support dependent children. 5. ~~X~~ I
will participate in NA and/or AA as recommended. 6. I will not consume alcoholic beverages. 7. I will not frequent
any establishment where alcohol is sold or served as its mains business. 8. I ~~widxxx~~ will not operate any motor
vehicle without permission of R of Parole Officer and a valid New York state driver's license. 9. I will
cooperate with all medical referrals and recommendations. A) I will proceed to INS Warrant #A38-746-586 dated 11/16/

56 Grattan St 1R
Bklyn. N.y 11237
2. 5. 01

To whom it may Concern

In Regards to our son/Brother Rohan,
R Persaud who is Incarnation with
I. N. S we beg you pardon if you
Can please release him from your
authority. Rohan have a family to
Confine himself to. His wife and childre
is going through a lot of stress.
We promise to guide him through
Counseling and to support him when
he is out.

Thank you.

yours truly,
Deochand Persa
Gentree Persaud
Zabina Samtaha
Rai Persaud.

FRANZ RICHARD FAIRWEATHER
Notary Public, State of New York
No. 24-01FA944166
Qualified in Kings County
Commission Expires Nov. 14, 20 02

ROHAN R. PERSAUD
Lackawanna County Prison
1371 N. Washington Av.
Scranton PA 18509

TO WHOM IT MAY CONCERN

Dear SIR

I am writing this letter in support of my release and I would be grateful with all my heart if you can release me on Parole.

I am truly sorry for my past mistakes and also remorseful for my past wrongs.

I am apologizeing and also asking for Leniency on my release decision. If released I will act maturely and responsibly, I will maintain a clear conduct and will remain steadily employed.

Thank you in advance for your consideration in determining my release on parole.

SINCERELY

Rohan R. Persaud.

Q94202404

License Number

Q94004029

### THE CITY OF NEW YORK
### OFFICE OF THE CITY CLERK
MARRIAGE LICENSE BUREAU

# Certificate of Marriage Registration

This Is To Certify That  Rohan Rampersaud Persaud

residing at  56 Grattan Street, 2L, Brooklyn, New York  11237

born on September 01,1966       at  Corentyne, Berbice  Guyana

and   Leela Dipnarine
New surname:  Persaud
residing at  56 Grattan Street, 2L, Brooklyn, New York  11237

born on       July 12,1965       at  Corentyne, Berbice  Guyana

## Were Married

on   April 18,1994        at   QUEENS
                               120-55 QUEENS BLVD., KEW GARDENS

as shown by the duly registered license and certificate of marriage of said persons on file in this office.

CERTIFIED THIS DATE AT THE CITY CLERK'S OFFICE

QUEENS,    N.Y.                           April 18, 19  94



PLEASE NOTE: Facsimile Signature
and seal are printed pursuant
to Section 11-A, Domestic
Relations Law of New York.

**Carlos Cuevas**
City Clerk of the City of New York

CET-F

Q 11349

# THE UNITED STATES OF AMERICA

CERTIFICATE OF NATURALIZATION



No. 14804949

*Petition No.* 01127949 · **ORIGINAL** · *INS Registration No.* A38 746

*Personal description of holder as of date of naturalization: Date of birth* JULY 12, 1965 , *sex* FEMALE
*complexion* DARK , *color of eyes* BROWN , *color of hair* BLACK , *height* 5 *feet* 2 *inches*
*weight* 130 *pounds, visible distinctive marks* NONE
*Marital status* SINGLE *Country of former nationality* GUYANA
*I certify that the description above given is true, and that the photograph affixed hereto is a likeness of*

*(Complete and true signature of holder)*

UNITED STATES OF AMERICA *ss:*
EASTERN DISTRICT OF NEW YORK
*Be it known that at a term of the* DISTRICT *Court*
EASTERN DISTRICT OF NEW YORK
*held pursuant to law at* JAMAICA, NY
*on* JUNE 14TH, 1991 *the Court having found that*
LEELA DIPNARINE
*then residing at* 595 OCEAN AVENUE, #6G, BROOKLYN, NY
*intends to reside permanently in the United States (when so required by the*
*Naturalization Laws of the United States), had in all other respects complied with*
*the applicable provisions of such naturalization laws, and was entitled to be*
*admitted to citizenship, thereupon ordered that such person be and (s)he was*
*admitted as a citizen of the United States of America.*
*In testimony whereof the seal of the court is hereunto affixed this* 14TH
*day of* JUNE *nineteen hundred and*
NINETY-ONE

*Seal*

ROBERT C. HEINEMANN
*Clerk of the* DISTRICT *Court.*
*By* _____ *Deputy Clerk.*

IT IS PUNISHABLE BY U. S. LAW TO COPY,
PRINT OR PHOTOGRAPH THIS CERTIFICATE,
WITHOUT LAWFUL AUTHORITY.

## DEPARTMENT OF JUSTICE

REV. 11-1-87)Y

DOCUMENT NO.  **D 006949**

...ty of New York                 Department of Health                 Vital Records

## CERTIFICATE OF BIRTH REGISTRATION

Below is an exact copy of a certificate of Birth registered for your child. It is sent without charge. If the certificate contains any errors, contact the Corrections Unit, Division of Vital Records, 125 Worth Street, New York, New York 10013. You will be advised how to have the record corrected. It is important to do this at once.    DO NOT RETURN THE CERTIFICATE.

The reproduction or alteration of this transcript is prohibited by section 3.21 of the New York City Health Code.

Notice    In issuing this transcript of the record, the Department of Health of the City of New York does not certify to the truth of the statements made thereon as no inquiry as to the facts has been provided by law.

MAYOR                 COMMISSIONER OF HEALTH                 CITY REGISTRAR

---

DATE FILED   VITAL RECORDS    **CERTIFICATE OF BIRTH**
DEPARTMENT OF HEALTH
BOROUGH OF MANHATTAN                      156-94-063700

94 JUL -6 PM 3: 25                    Birth No.

| | (Type or Print)   First Name | Middle Name | Last Name | | | |
|---|---|---|---|---|---|---|
| **1. FULL NAME OF CHILD** | MOHAN | DERAN | PERSAUD | | | |

| **2. SEX** | **3a. NUMBER DELIVERED** of this pregnancy  1 | **4a. DATE OF CHILD'S BIRTH** | (Month) JUNE | (Day) 22ND | (Year) 1994 | **4b. Hour** 3:25 | ☐ AM ☒ PM |
|---|---|---|---|---|---|---|---|
| MALE | **3b.** If more than one, number of this child in order of delivery | | | | | | |

| **5. PLACE OF BIRTH** | **5a.** NEW YORK CITY BOROUGH OF BROOKLYN | **5b.** Name of Facility (If not in institution street address) WOODHULL MEDICAL AND MENTAL HEALTH CENTER | **5c.** TYPE OF PLACE ☒ Hospital ☐ Home ☐ Birthing Center ☐ Other |
|---|---|---|---|

| **6a.** MOTHER'S FULL MAIDEN NAME LEELA DIPNARINE | **6b.** MOTHER'S DATE OF BIRTH (Month) JULY (Day) 12 (Year) 1965 | **6c.** MOTHER'S BIRTHPLACE City & State or foreign country GUYANA |
|---|---|---|

| **7. MOTHER'S USUAL RESIDENCE** a. State NEW YORK | b. County KINGS | **7c.** City, town, or location BROOKLYN | **7d.** Street and house number 56 GRATTAN STREET | Apt. #2U | Zip 11237 | **7e.** Inside city limits of 7c? Yes ☒ No ☐ |
|---|---|---|---|---|---|---|

| **8a.** FATHER'S FULL NAME ROHAN RAMPERSAUD PERSAUD | **8b.** FATHER'S DATE OF BIRTH (Month) (Day) (Year) | **8c.** FATHER'S BIRTHPLACE City & State or foreign country GUYANA |
|---|---|---|

| **9a.** NAME OF ATTENDANT AT DELIVERY ☐ R.N. ☐ C.N.M. ☐ Other Midwife ☐ D.O. ☐ M.D. | **9b.** I CERTIFY THAT THIS CHILD WAS BORN ALIVE AT THE PLACE, DATE AND TIME GIVEN  ☐ R.N. ☐ C.N.M. ☐ Other Midwife ☐ D.O. ☐ M.D. |
|---|---|
| Information added or amended | Signed |
| | Name of Signer  F. FRANCIS |
| (Reason) | Address  760 BROADWAY, BROOKLYN, NY |
| Date          City Registrar | Date Signed  JUNE 22ND    19 94 |

**VITAL RECORDS**         **DEPARTMENT OF HEALTH**         **THE CITY OF NEW YORK**

| Name   LEELA PERSAUD | Print here the mailing address of mother. |
|---|---|
| Address   56 GRATTAN STREET   Apt. #2U | Copy of this certificate will be mailed to her |
| City   BROOKLYN   State   NEW YORK   Zip   11237 | when it is filed with the Department of Health. |

# BEDESSEE IMPORTS INC.

International Foods • Fish & Spices

***BROKERS • IMPORTERS • EXPORTERS • DISTRIBUTORS***

TORONTO • MONTREAL • NEW YORK • FLORIDA

601 WORTMAN AVENUE
BROOKLYN, N.Y. USA 11208
**TEL: (718) 272-1300 • FAX: (718) 272-6868**
**www.bedessee.com    E-mail: info@bedessee.com**

**BI**

QUALITY PRODUCTS SINCE 1977

**BEDESSEE
Sporting Goods**

*The largest distributor of all major brands
of Cricket Equipment*

March 7th, 2001

Rohan Persaud
56 Grattan Street
Brooklyn, NY 11237

**Re:    Job Status:**

To whom it may concern,

I would like to inform you that I Verman Bedessee of Bedessee Imports Inc. will re-employee Mr. Rohan Persaud once release on any circumstance.  Mr. Rohan Persaud is a former employee of this firm and we consider him as an honest and hard working person. We value his effort and commitment to work to give us that little more interest in the day-to-day operation of our corporation.

Our current workweek is from Monday-Saturday.  Our business hours vary from 9:00am to 9:00pm.  He will be employed as a fulltime employee.

If you need more information you can contact me at the above number.

Sincerely,

Verman Bedessee
US VP

*We're in your kitchen more than you think!*